Our first case for argument this morning is United States v. Alfredo Viveros-Chavez. Dean Chemerinsky, welcome. Good morning. May it please the Court. My name is Erwin Chemerinsky and I represent the appellant Alfredo Viveros-Chavez. The issue before this Court is whether equal protection is violated by a federal statute that says 99% of the time against those of one race was adopted with an expressed racist history. There are two specific questions. First, whether the Arlington Heights framework applies to a criminal statute in the immigration context. And second, if so, is there sufficient proof of discriminatory intent? I want to focus on the second question, but I'm glad to discuss the first because it was the basis for the case, the basis that other courts of appeals have used for their ruling. There's no dispute that the 1929 statute was adopted with an express racist history. The district court concluded that here. Therefore, the issue is, was the 1952 statute a reenactment or a new law? Did it, in the words of the Supreme Court, purge the racist history of the 1929 statute? And was there discriminatory intent in the 1952 statute? Actually, if I could interrupt on that very point, the Supreme Court has never adopted that as a legal standard. There is no requirement to purge or that the legislature purge in a deliberative way a statute. The Supreme Court's decision in Hunter v. Underwood, and it's made more explicit in Justice Alito's concurring opinion in Espinoza v. Montana Department of Revenue, and also in the opinions in Ramos v. Louisiana. And that would be the basis for saying that there has to be something that indicates that there was a change. The problem is that Abbott v. Perez explicitly rejects this argument. But, Your Honor, in Abbott v. Perez, the United States Supreme Court was explicit that it was not a reenactment of the statute, but a new statute. Here I would direct you to the language of Abbott v. Perez, specifically at 138 Supreme Court 2325. Quote, nor is this a case in which a law originally enacted with a discriminatory intent is later reenacted by a different legislature. What makes that different here, Your Honor, is this was a reenactment. Well, that was a descriptive statement. It wasn't a suggestion that a different rule would apply. But that does pose to you the crucial question. Is this a reenactment, which Abbott, in the language I just said it wasn't, or is this a new statute as the district court held? My point is that that distinction between a reenactment and a new piece of legislation isn't a trigger for a different standard of review, for a different rule. But when Abbott decision explicitly ruled out any obligation to purge the taint and any flipping of the burden and placing on the government the obligation to establish that the statute that's under review in a specific case purge the taint of a prior discriminatory statute. I would disagree, Your Honor. We don't have any dispute that the 1929 statute was adopted for a discriminatory reason. We also have in the history, the Senate report, the congressional record, that they said that the 1952 statute was, and I'm going to use the words of the Senate report, a reenactment. And we have in Hunter v. Underwood, the Supreme Court saying the fact that there's minor changes in a statute doesn't eliminate the prior discriminatory intent. And this statute was minor changes. Hunter, though, didn't involve a reenactment of a previous statutory scheme. It was a constitutional provision, a state constitutional provision that had been under review and had in some respects been pared away or narrowed by judicial decisions. And that was the reason for the descriptive language in Abbott about the status of the law that was under review in Abbott. And the court made clear that the court's obligation, or the party's obligation and the court's obligation, is to examine the intent of the legislature that adopted the statute that is presently under review before the court. I think this parallel to Hunter v. Underwood is strong here. The law was initially adopted in Hunter v. Underwood for racist reasons. There were minor changes over time, but the court still found that the initial racist motive proved discriminatory intent. Here, if you look at what happened in the 1952 statute, and this is where we disagree with the district court, there were minor changes only to strengthen the statute. Under the 1929 law, it had to be proved where somebody illegally crossed the border. The 1922 statute is enough that somebody is found in the country. Under the 1952 statute, it is the same provisions as the 1929 other than making it stronger. Why does it matter that a change is minor versus major if what the legislature in 1952 is doing is looking at the words of the statute and then trying to decide whether the text of the statute, in other words, if someone were to submit the text as is, whether that made sense in the context of what they were considering in 1952? It's crucial, Your Honor, to ask the question, does the 1952 statute change anything with regard to the racist intent of the 1929 statute? I guess my question is, if I'm a congressperson and if I'm looking at whether or not I need to change the provisions of a particular law, I don't think I'm necessarily concerned about what motivated the original language in the first place. What I'm concerned about is when this law is published to the public and people look at the language of the statute, whether it effectuates the policy goals of the current time that I'm concerned with. But, Your Honor, we're dealing with one statute, Section 1362. We know it was adopted in 1929 with racist motives. The question is, does the 1952 reenactment change anything with regard to it? And what I'm suggesting to you is that Congress just said, we want to reenact it. Let me quote you the words from the Senate report. This is Senate Report 81-1515. I guess why I'm pushing back, one of the amicus briefs talks about silent, benign, and I forget what the third one is, reenactments. And I guess I understand the difference between the silent one is where they don't even think about it and they just reenact it, just pro forma. The silent one, though, you know, the legislature is actually taking a look at the words of the statute and deciding, okay, well, does it make sense? And so I'm wondering why that doesn't kind of undercut the weight of whatever the original intent may have been. But here, Your Honor, as I said to Chief Judge Sykes, I think it's important to look 100 percent. Also, Justice Alito's opinion, Espinoza's in Montana Department of Revenue, and the opinions in Ramos v. Louisiana, Justice Sotomayor, and also Justice Kavanaugh, that say when you have a statute with a racist history, there is an obligation to purge the tent. But, Your Honor, and I would respond also in this way to Chief Judge Sykes' questions, if you look at the 1952 legislative history, there's also a great deal of racist motivation expressed for it. But the district court judge said here is, well, there are only four quotes that are racist. Of course, as we say in our reply brief, there's a lot more than just those four statements. If you look at the Senate report, for example, in 1950, in many different places they expressed a racist motivation. All Arlington Heights requires is that race be a motivating factor. You don't need to show a majority of the legislators expressed racism, because that's a standard that would never be met. So even if we focus on the 1952 statute, which has to be in the context of the 1929 law, the district court errs in not finding sufficient racist motivation. It also has to be remembered that this is a law that is used 99% of the time against those of one race. The district court said there was no comparator, but as we put out in the reply brief, there are comparators. You could look at the number of undocumented individuals. Only 80% of them are Latinx, compared to 99% of being used this time against Latinx individuals. You can look at how those from Canada are treated. You can look at those who overstay visas and how they're treated. And Arlington Heights says explicitly, when there is a pattern so stark as to leave no other explanation, that's a basis for discriminatory intent. So when you put all of this together, that's why the district court erred in not finding sufficient discriminatory intent to meet the Arlington Heights standard. Is there any data in the record with regard to those comparator classes? In other words, that are more specific or more particularly similar to the situation here. So is there data regarding people that have illegally reentered and whether or not those people are prosecuted? Not at that level. I mean, the three things that I would point to are the ones that I said. The percentage of undocumented individuals who are Latinx compared to the percentage that are prosecuted under the statute. It's 80% versus 99%. That's in the amicus brief. And then there's the statistics about those from Canada and those who overstay visas who are overwhelmingly white and how they're treated differently. With your permission, I'll save my remaining time for rebuttal. That's fine. Thank you. Mr. Peabody. Good morning, Your Honor, and may it please the Court. Tom Peabody for the United States. Like Mr. Chemerinsky, I'd like to start with Arlington Heights, but I'm happy to answer any questions regarding the rational basis review that we put forth in our brief. I guess with regard to the rational basis review argument, the government characterizes this as an immigration statute. But isn't it really a criminal statute? In other words, the statute doesn't dictate who is admitted into the country. It doesn't dictate who is deported. It regulates the activity of persons who are already in the United States and sets forth criminal penalties for particular actions. Isn't that just a run-of-the-mill criminal statute? How is it an immigration statute? I think it's both, Your Honor. Well, I guess my question is how is it an immigration statute? Because there's no immigration ramifications. It's just more kind of various criteria that need to be met before the criminal sanctions would apply. I think it is a deterrent to aid the other immigration provisions that appear elsewhere in Title VIII. I sort of think the Ninth Circuit's description of it is apt. It is that Section 1326 exists to give teeth to immigration laws and more specifically to deportation orders. I appreciate that distinction and that maybe unlike some of the cases that the Supreme Court has reviewed that maybe more purely could be described as an immigration regulation, this one does have criminal implications. I still think on balance, and I appreciate that the rational basis question is a bit of a thornier one than the Arlington Heights one in our view. I still think on balance, rational basis should apply. This Court has applied the Mandel and Matthews lines of decisions in criminal cases before. We cite one of them. That's Montenegro in our brief. And I do not read the Supreme Court's precedents to suggest that the due process concerns that come with a criminal proceeding trump somehow the plenary power of Congress and the executive to make and enforce their immigration regulations, which is the upshot of every single one of those decisions. Is there a constitutional basis for your argument that deferential review rather than heightened scrutiny applies? Is it basically a separation of powers? That's exactly right, Judge. That is from where Matthews and Mandel and the like derive. Before leaving this issue, although having to take more questions on it, I think the rub here is that the challenge is that this is not just a classification on the basis of citizenship or alienage. That clearly always gets rational basis review. The challenge is that it's also one based on race, and so it should get heightened scrutiny, in this case under Arlington Heights. Here's why I think that's wrong. If you take a look at Fialo, it addresses claims like this, which the Supreme Court there described as a double-barrel type of challenge. But Fialo dealt with who gets let in, right? It dealt with who is admissible to the country. And again, looking at this statute, while the statute may have various kind of determined consequences, it says nothing about, as a statute in Fialo, who is admitted in the country and who is not. Section 1326, I think that's absolutely correct, Judge. I will say that on Fialo, it does not shy away from what it is doing, Fialo. Fialo says, yeah, maybe the dissent is right. In other contexts, because this is a sex-based discrimination, we may apply intermediary scrutiny. But here we don't, and it references Mandel, which was a First Amendment case. Same thing, typically a higher standard of review applies when there's a First Amendment challenge. Not so in the immigration context. Our point, at the risk of making too neat a syllogism, is that an Arlington Heights challenge fits more neatly within those than within the other camp. I do want to return to Arlington Heights. As I understand the duty to purge theory as it's promoted on the other side, it is one that, in our view, misreads Abbott and severely overreads Ramos and Espinoza and attempts to make comments in the concurrences in those latter two opinions into law. I think as Judge Sykes correctly pointed out, that's very much not the case. Here's a distinction that seems to be very important in their view of this duty to purge theory, and that is whether a law is a new law or a reenacted law. I believe Mr. Chemerinsky was about to reference in his comments earlier page 665 of the Senate report, and he's right, there they do use the word reenactment in conjunction with the reentry law. But here's the problem. If you read the full sentence, it starts with, it was commented. That passive voice indicates that what the Senate report is doing there is referencing comments it received during its work in promulgating the report. Here's what actually happened, though, just like in Abbott. Section 1A and Section 2 of the 1929 Act were repealed, just like in Abbott. That's at Section 403, subsection 30 of the Immigration and Nationality Act. Just like in Abbott, we have a law that was repealed and a new law took its place. This is not in the record, but I will tell you I ran a red line between Section 1A of the 1929 Act and Section 1326 as it was in 1952, and you will see a lot more changes than you will see similarities. As this court knows, I believe the point was made earlier, the crime for which defendant was convicted here was not even a crime under the 1929 Act. In circumstances like that, where Congress repeals the old law and makes a new law, Section 26 has greater reach in some respects. It adds the Founding Clause. It prohibits collateral attacks by removing the In Pursuance of Law Clause, as well as creates exemptions, among others, that authorization can be sought prior to reentry. In a case like that, with a very new law and the old one appealed, Abbott is crystal clear about what matters, and what matters is the intent of the 1952 Congress in enacting the Immigration and Nationality Act. With regard to that, that's a good segue to looking at the comments of the various legislatures that the appellant relies on. The District Court and the government found, the government argues that we only have four legislatures here that are talking about this. And I guess my question, I have a couple questions. One is, well, how many is enough? And two is, presumably, of course we have to rely upon the words of legislatures, because whether it's in the report, a written report, or what have you, it's their words. And so just as a matter of kind of foundational premise, you have to look at what they say, what they write, and how they debate. And so I guess it goes back to circling around my first question is, how are we then supposed to tell the intent of the legislature, right? Yes, Judge. I think the cases are fairly clear that the best place to start is the congressional records and the Senate reports. Now, I understand that there are more than a few offensive remarks that I don't intend to defend, because I can't. Could you speak up a little? Oh, I apologize, Judge Flom. The congressional record and the House reports and the Senate reports are the best place to start. It's important to remember that what is key under Arlington Heights is that the discriminatory intent be a motivating reason for the legislation. Well, where would that appear? It would appear, of course, in those two sources. Here we have those reports, and they say nothing of discriminatory animus against Latinx individuals. Instead, they lay out what are the very obvious policy reasons to have teeth to your deportation orders, unlawful reentry prohibition. I think we sort of have two problems here when it comes to the comments that have been pointed out by the other side, the first of which is it is just a handful. Under O'Brien and other cases, that doesn't cut it. This isn't interpreting legislative intent when doing statutory construction. O'Brien is clear about that. To say that a Congress acted with animus is a whole other ballgame, and five legislators is not going to cut it. The other problem we have is that, yes, these remarks were racist, but none were in connection with respect to what became 1326. And Brinovich is clear about the effect of a different legislature. That's a different issue. But other cases, like Regents most recently, it's very clear that, you know, things happen outside, not saying one way or another, but for a challenger to a law to use extraneous comments to challenge what is a facially neutral and very sound policy decision to criminalize reentry is too far under Arlington Heights. I guess, you know, we're talking about the comments made during the passage consideration of the anti-harboring statute. And my question is, one of the arguments the government makes that we shouldn't give much weight to the racial animus of the 1929 Congress is that there was a big turnover of people, right? And so why isn't the converse true? If there is no turnover of people, in other words, if it's the same Congress, and the same Congress, when discussing a bill that was enacted only three months before this one, exhibits indications of racial animus towards Mexicans, then why isn't that at least relevant or probative of something that we should consider when considering whether that same Congress was motivated by similar racial animus when enacting 1326? Judge, I don't think we resist that it's relevant and it's something you can consider. I think the problem is that it's so disconnected from the 1326 statute that, again, starts with the 81-1515 Senate report that it just says very little about why Congress enacted this particular provision. Our brief sets out why, as offensive of a name that is, the upshot of that law was not one that sort of, if it were subject to its own Arlington Heights analysis, we think would pass muster, and obviously that's not this case. I do just want to note also, Judge Lee, we do not agree with the district court's finding and other courts' findings that the 1929 law was passed with racial animus. We don't think it, again, if this court were to, if that were the law that were being challenged, that it would pass muster. That's of course not this case and this court can do it. and either find that it is or it isn't, and then move on and give it what, under the Supreme Court's precedent as they framed it, gets very little probative value in deciding the intent of the post-war veto overriding 82nd Congress and their passage of the Immigration and Nationality Act. So you disagree with Appellant's counsel that the, whether or not the 1929 statute was motivated by racial animus is a undisputed issue? Correct. It is disputed in this case. Your Honors, I'd like to just address two final points. I understood Mr. Chemerinsky to reference that we have a pattern today of 99% of prosecutions being against those of Latinx background, and that is so stark under Arlington Heights that it's unconstitutional. That is a reference if you read Arlington Heights. Arlington Heights calls that an unusual exception. It almost never comes up. It's a reference to Gabellion and Yick Woe. That is not how this case has been argued to date. To put it mildly, this case is not like those cases. Yick Woe, for example, involved laundromat ordinances in Northern California. People of Chinese descent got none. Nobody else had a problem getting any. So there you have your enumerator and your denominator, and you can conclude it is so stark. That is a new theory in this case that this Court may not weigh in on. Well, we also have no contextualizing record evidence here for that statistic. Exactly correct, Judge. As the District Court said, we lack a comparator. You could also call it a denominator, as I just did. Unless there are any further questions from the Court, we would ask that you affirm the District Court and the defendant's conviction. Thank you. Rebuttal. I would make two points by way of rebuttal. First, strict scrutiny is for criminal statutes, even in the immigration context, when alleged to be racially discriminatory. The cases opposing counsel refers to, Matthews v. Diaz-Mandel, were not race discrimination cases. And the Supreme Court, in its most recent addressing of the topic, the Department of Homeland Security v. Regents of the University of California, in its 140th Supreme Court, page 1915, made clear Arlington Heights is used even in the immigration context. The second point is that there is sufficient evidence of discriminatory intent under Arlington Heights. We could certainly go back to the legislative history of 1929. It's described in pages 8 to 14 of our opening brief. But a great deal of the focus now is on the 1952 statute. And here I very much disagree with opposing counsel's characterization. He says that the reports don't say anything with regard to race. Your Honors, I would direct you to Senate Report 81-1515, pages 577, 579, 580, 584, 585, and 586, all of which you see expression of the same racist motivations as in the 1929 statute. He says it's only a handful of legislators. Here I'll go to Judge Lee's question of what's enough. The district court said just four, and I'll reply briefly, but there's many more than that. It includes the sponsor of the bill, Senator McCarran. It includes legislators such as Senator Walter George, who said, quote, The goal of the statute is to preserve the homogeneity of the American people. This should be enough in the context of Arlington Heights to show a discriminatory intent. This is especially so in the context of a law that's a reenactment from what was in 1929. I pointed you to the language of the Senate report that said it's a reenactment, but also in the congressional record. And this is from 98, page 4441. It says that the 1952 law is, quote, an attempt to codify and clarify existing law. It, quote, reiterates existing immigration policies. If you were to compare the 1929 and the 1952 law, what the 1952 law does is make the 1920 law stricter. It, for example, was under the 1929 law have to be proven that somebody illegally crossed the border. Under the 1952 law, all that has to be proven is they're found in the United States. The 1929 law applied only to somebody who was deported. The 1952 law also applied to someone who was denied admission. Mr. Chemerinsky, I think you're referencing in part comments by Representative Yorty and McCarran. Yes, Your Honor. And I think the Deputy Attorney General Payton Ford. Yeah, Payton Ford. Now, are we to take from which none of those comments I read is specific to 1326. So for three officials, one of which is not a member of the Congress, to make those comments, we should impute to the entire body of another Congress. Yeah, Congress as an institution continues, fortunately, since the time of the Republic. But we number the Congresses by different numbers every two years. So it's not the same Congress in 1952 that there was in the 20s. So how do we link comments that are not necessarily representative of a majority? How can we read into it a majority of the Congress of the 52 as having an intent? Arlington, it's a little bit of a stretch, it seems. Arlington Heights does not require that there be a showing that a majority of the legislators expressed a racist motive. Because if that's the test, it will never be met. Arlington Heights says, and I quote, it has to be a motivating factor. And what I focused on is Senator McCarran, who was a sponsor of the 1952 law, Senator Walter George in 1952, the Senate report that preceded the 1952 statute. Now, I think the 1929 law is crucial because the issue is, did the 1952 statute purge the taint? But even the 1952 statute on its own terms had a racist motivation. And that's where the district court failed. I see that I'm out of time. Thank you so much. Thank you very much. Our thanks to all counsel. The case is taken under advisement.